# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF INDIANA
### HAMMOND DIVISION

| | | |
|---|---|---|
| ELOISE TURNER, | ) | |
| | ) | |
|     Plaintiff, | ) | |
| | ) | |
| v. | ) | NO. 2:08-CV-130 |
| | ) | |
| W.R. GRACE, | ) | |
| | ) | |
|     Defendant. | ) | |

## <u>OPINION AND ORDER</u>

This matter is before the Court on (1) the Defendant's Motion for Summary Judgment (D.E. #27) filed on June 30, 2009, and (2) the Defendant's Motion to Strike Portions of Plaintiff's Statement of Genuine Issues and Her Response to Defendant's Statement of Material Facts (D.E. #41) filed on October 6, 2009. For the reasons set forth below, the Motion for Summary Judgment (D.E. #27) is **GRANTED** and the Motion to Strike is (D.E. #41) is **GRANTED in part and DENIED in part**. Accordingly, the Clerk is **ORDERED** to enter judgment on behalf of Defendant and against Plaintiff. The Clerk is further **ORDERED** to close this case.

<u>BACKGROUND</u>

On April 29, 2008, Eloise Turner ("Turner") filed a Complaint and Demand for Jury Trial (D.E. #1) ("Complaint") against

Defendant, W.R. Grace ("Grace"), alleging race discrimination in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e, *et seq.*, as amended, and 42 U.S.C. § 1981. (Complaint ¶32.) Turner claims that Grace discriminated against her on the basis of race by failing to hire her as a regular employee into an open position for which she was qualified. (Complaint ¶25.) Turner claims Grace further discriminated against her by offering similarly-situated Caucasian employees different terms and conditions of employment. (Complaint ¶26.) Finally, Turner claims Grace discriminated against her by failing to hire her as a regular employee on or about May 2007 thus affecting the constructive discharge of her employment. (Complaint ¶ 27.)

Grace filed the currently pending Motion for Summary Judgment arguing that it is entitled to judgment as a matter of law on Turner's claims. Grace has also filed a Motion to Strike a large portion of Turner's evidence submitted in opposition to Grace's Motion for Summary Judgment.


PRELIMINARY EVIDENTIARY ISSUES

Grace moves to strike a significant portion of Plaintiff's Appendix I Statement of Genuine Issues (D.E. #33)("Statement of Genuine Issues"). Generally, Grace argues that Turner's version of the facts is not supported by the record, is not supported by admissible evidence, is hearsay, is not based on personal

-2-

knowledge, and is not authenticated. Grace also argues that Turner improperly disputes Defendant's Statement of Material Facts in Support of its Motion for Summary Judgment (D.E. #29) ("Statement of Material Facts") by contradicting her own sworn deposition testimony, relying on conclusory statements, and improperly disregarding record evidence.

The Court need only address the admissibility of the contested evidence necessary for deciding this summary judgment motion. All evidentiary issues not necessary for ruling on this motion are **DENIED** as moot. For the reasons set forth below, Grace's motion to strike is **GRANTED in part and DENIED in part.**

*Turner's Responses to Grace's Statement of Material Facts*

Grace argues that all of Turner's responses to Grace's Statement of Material Facts should be stricken except Turner's Response to paragraph 55. Turner requests the Court to deny Defendant's motion, but presents no argument. Accordingly, all arguments in this regard are deemed waived and Turner's responses to these paragraphs are **STRICKEN**. *See Border v. City of Crystal Lake*, 75 F.3d 270, 274 (7th Cir. 1996) (finding undeveloped arguments waived).

*Turner's Statement of Genuine Issues*

Grace argues that the following paragraphs of Turner's Statement of Genuine Issues should be stricken because they are based on inadmissible hearsay: 12-14, 23, 29, 31, 35, 40, 48, 54, and 57. The only basis for admissibility Turner argues is that statements made by Tuskan are not hearsay because they are admissions by a party opponent. Because Turner does not argue any other reason that these contested paragraphs should be admitted, additional basis are deemed waived. *See Border*, 75 F.3d at 274. Accordingly, paragraphs 12 and 54 of Plaintiff's Statement of Genuine Issues are **STRICKEN** because the testimony supporting them consists solely of out-of-court statements from declarants other than Tuskan. Similarly, Turner's testimony of out-of-court statements from declarants other than Tuskan set forth in paragraphs 13, 14, 31[1], 40, and 48 are **STRICKEN.**

Regarding statements Turner testified were made by Tuskan, Turner contends these are admissible because they are admissions by a party opponent. Rule 801(d)(2)(D) of the Federal Rules of Evidence states that a statement is not hearsay if it is offered against a party and is "a statement by the party's agent or servant concerning a matter within the scope of the agency or employment,

---

[1] Testimony supporting paragraph 31 is stricken to the extent Turner testified, "I was overlooked the first time and advised that I had to wait six months" (Turner Dep. at 143) because there is no evidence as to who advised her that she had to wait six months.

made during the existence of the relationship." Fed. R. Evid. 801(d)(2)(D).

Here, six out-of-court statements are at issue. First, Turner testified that "Chuck mentioned 'you're doing a good job. You know, there's a few things that you still have to work on.'" (Turner Dep. at 111). Second, Turner testified that after Moranski quit, Tuskan told her "I think you're doing an excellent job." (*Id.* at 152.) Third, Turner testified that Tuskan asked her to stay on and show Moranski the daily duties and responsibilities of a production accounting clerk. (*Id.* at 130.) Fourth, Turner testified that when Tuskan told Turner that Moranski quit, he "extended the offer to me and mentioned that I had to be there six months." (*Id.* at 134). Fifth, Turner testified that when she inquired about the status of her employment, Tuskan replied "[s]ix months is coming." (*Id.* at 136.) Sixth, Turner testified that Tuskan told her when Moranski quit "You should be hired—" "It's Grace's policy that you have to stay six months and then we can hire you." (*Id.* at 105.)

At the time the statements were made, Tuskan was Turner's direct supervisor. (Turner Dep. at 102, Winkley Dep. at 15, 17, 94.) Also, he had input on hiring an employee to fill the production accounting clerk position (Winkley Dep. Ex. 10 ¶ 19), he interviewed Turner for the position (Turner Dep. at 124), he discussed her work with Winkley (Winkley Dep. at 50-51), and he was

directed by Winkley to communicate employment decisions to Turner (*id.* at 51).

Because Tuskan's job at Grace included involvement in the hiring process, supervising Turner's work, evaluating Turner's performance, and communicating employment decisions to Turner, Tuskan's statements to Turner regarding her job performance, terms and conditions of employment, and hiring are within the scope of his employment with Grace. *See Nekolny v. Painter,* 653 F.2d 1164, 1171-72 (7th Cir. 1981). Accordingly, Grace's motion to strike is **DENIED** as to Turner's above outlined testimony of Tuskan's out-of-court statements supporting paragraphs 13, 14, 23, 29, 31, 35, 40, 48, 57.

*Turner's Evidence*

Grace argues that the following paragraphs of Turner's Statement of Genuine Issues should be stricken because they, in whole or in part, are not supported by the record: ¶¶ 2, 11, 13, 20, 23, 29-32, 35-37, 39-41 and 56. Turner argues that the citations support the facts cited and that all reasonable inferences should be drawn in her favor.

To avoid summary judgment in Grace's favor, Turner may not rest upon mere allegations, but must "set out specific facts showing a genuine issue for trial." Fed. R. Civ. P. 56(e)(2); *see also Becker v. Tenenbaum-Hill Assocs.*, 914 F.2d 107, 110 (7th Cir.

-6-

1990). "[A] court is not required to 'scour the record in search of evidence to defeat a motion for summary judgment.'" *Ritchie v. Glidden Co.*, 242 F.3d 713, 723 (7th Cir. 2001)(quoting *Bombard v. Fort Wayne Newspapers, Inc.*, 92 F.3d 560, 562 (7th Cir. 1996)). Moreover, as outlined below, to the extent the record does not support Turner's version of the facts, they will not be considered. *Mayes v. City of Hammond, Ind.*, 442 F. Supp. 2d 587, 596 (N.D. Ind. 2006).

Paragraph 2 of Turner's Statement of Genuine Issues states that "Turner was hired by Defendant as a temporary employee through Kelly Services . . . [Tab A, Turner Dep. pp. 30, ll. 12-25; 63-64, ll. 17-4]." The record shows that Turner had "been with" Kelly services since 1995 and she worked on assignment at Grace beginning in December 2006. (Turner Dep. at 63.) Accordingly, this paragraph is **STRICKEN** to the extent it does not accurately portray the record.

Paragraph 11 of Turner's Statement of Genuine Issues states that "Kelly Services did not receive any negative feedback regarding Turner's performance. [Tab A, Turner Dep. p. 46, ll. 13-16]." All testimony supporting this paragraph was stricken as hearsay in connection with paragraph 40, as discussed above. Accordingly, paragraph 11 is also **STRICKEN**.

Paragraph 13 of Turner's Statement of Genuine Issues states "Turner's direct supervisor, Chuck Tuskan (plant supervisor)

informed Turner that she was doing a good job and to keep up the good work. [Tab A, Turner Dep. pp. 99-100, ll. 25-1; p. 102, ll. 14-15; pp. 110-111, ll. 25-3; p. 152, ll. 6-11]". The cited testimony does not support the conclusion that Tuskan informed Turner to keep up the good work. As discussed above, however, admissible evidence supports the contention that Tuskan told Turner she did a good job (Turner Dep. at 111) and that she was doing an excellent job (*id.* at 152). This paragraph is **STRICKEN** to the extent it does not accurately portray the record.

Paragraph 20 of Turner's Statement of Genuine Issues states "Defendant hired Jill Moranski, a less qualified Caucasian female[,] on March 7, 2007. [Tab A, Turner Dep. p. 46, ll. 13-16; p. 102, ll. 14-15; pp. 108-109 pp. 110-111, ll. 25-3; pp. 139-140, ll. 21-25; Tab B, Winkley Dep. pp. 53-54, 56]." Turner's citations to the record do not establish that Jill Moranski was a less qualified Caucasian female, nor do they show that Moranski was hired on March 7, 2007. Accordingly, this paragraph is **STRICKEN**.

Paragraph 23 of Turner's Statement of Genuine Issues states that "Turner was asked by her supervisor, Charles Tuskan, to continue her work as a temporary worker until March 16th in order to train Moranski. [Tab A, Turner Dep. p. 130; Tab B, Winkley Dep. pp. 77-78]." The record supports the contention that Tuskan asked Turner to stay on and train Moranski as to the "daily duties and responsibilities of the job." (Turner Dep. at 130.) This paragraph

is **STRICKEN** to the extent it does not accurately portray the record.

Paragraph 31 of Turner's Statement of Genuine Issues states "[a]t the time, Supervisor Tuskan told Turner that it was Defendant's policy that she work six (6) months as a temporary work [sic] before she could be hired as a regular employee. [Tab A, Turner Dep. p. 134, ll. 4-6, p. 136, ll. 6-10; p. 143, ll. 5-10.]" Turner's citations do not establish this. As such, this paragraph is **STRICKEN** except to the extent that Turner testified as follows: (1) that when Tuskan told Turner that Moranski quit, he "extended the offer to me and mentioned that I had to be there six months" (Turner Dep. at 134) and (2) that when she inquired about the status of her employment, Tuskan replied "[s]ix months is coming" (*id.* at 136).

Paragraph 32 of Turner's Statement of Genuine Issues states that "Tuskan's statement to Turner was a lie. Defendant does not have any policies requiring temporary employees to work for six months before being hired as a regular employee. [Tab B, Winkley Dep. at 66, ll. 16-19; Tab C, RFA's 6-7; Tab D, RFA 1-2]." These citations do not establish the conclusion that Tuskan's statement to Turner was a lie, and, therefore, that portion of this paragraph is **STRICKEN**.

Paragraph 35 of Turner's Statement of Genuine Issues states "[n]evertheless, Tuskan informed Turner that although she was doing

an excellent job and he wanted to keep her she still had to wait six months before being hired full time. [Tab A, Turner Dep. P. 152, ll. 6-11]." Turner's citation supports the contention that when Moranski quit, Tuskan told her "I think you're doing an excellent job. I want to keep you. We have to wait the six months." This paragraph is **STRICKEN** to the extent it does not accurately portray the record.

Paragraph 36 of Turner's Statement of Genuine Issues states "[a]ccording to Winkley, at the time Moranski quit the possibility of hiring Turner was discussed by Tuskan and Winkley. [Tab B, Winkley Dep. p. 50, ll. 17-22]." The record supports the contention that Winkley testified that she and Tuskan discussed the possibility of hiring Turner if she could go through a couple of month-ends showing improvement. This paragraph is **STRICKEN** to the extent it does not accurately portray the record.

Paragraph 37 of Turner's Statement of Genuine Issues states "Winkley never discussed or spoke with Turner regarding any alleged mistakes on the job. [Tab B, Winkley Dep. p. 32]." The cited evidence does not support this statement, and this paragraph is, therefore, **STRICKEN**.

Paragraph 40 of Turner's Statement of Genuine Issues states "Turner met Defendant's legitimate performance expectations related to the production accounting clerk position. [Tab A, Turner Dep. p. 46, ll. 13-16;  ll. 25-1; p. 102, ll. 14-15; pp. 108-109 pp. 110-

111, ll. 25-3; Tab B, Winkley Dep. pp. 53-54 and 56]." The cited record evidence does not establish this conclusion as a fact, nor is it a valid inference based on the record. Accordingly, this paragraph is **STRICKEN**.

Paragraph 41 of Turner's Statement of Genuine Issues states that "[a]ccording to Winkley the only reason that Turner did not receive the production accounting clerk position because she allegedly made too many mistakes. [Tab B, Winkley Dep. pp. 41-42, ll. 23-3.]" The cited evidence does not show that this was the only reason, and, therefore, that portion of this paragraph is **STRICKEN**. Rather the record shows that during Turner's interview, Winkley informed Turner that she did not feel Turner was catching on as quickly as she would have liked. (Turner Dep. at 107; Winkley Dep. at 31.) Winkley also told Turner that she was making too many errors and that they were repetitive. (Winkley Dep. at 31.) The record also shows that during Turner's interview, Tuskan told Turner that she did not have sufficient manufacturing experience and that there were a couple of accounting areas she needed to work on. (Turner Dep. at 127-128.)

Paragraph 56 of Turner's Statement of Genuine Issues states "[t]he policy further stated that if not hired at the end of the six month period the temporary worker's assignment must end and that worker was prohibited from working with Defendant again for a period of six months. [Tab A, Turner Dep. P. 87 ll. 19-24; Ex. 9]."

Exhibit 9 of Turner's Deposition shows that the policy actually states that "A temporary worker formerly assigned to Grace in an assignment that is subsequently completed (regardless of length), may again be selected for a different temporary assignment at Grace, but only after a six-month period away from Grace." (Turner Dep. Ex. 9.) This paragraph is **STRICKEN** to the extent it does not accurately state Grace's policy.

DISCUSSION

*Facts*

Grace is a diverse international chemical manufacturing company. (Winkley Dep. at 14.) Patricia Winkley is, and during all relevant times was, the plant manager at Grace's East Chicago facility. (*Id.* at 15-16.) She is responsible for managing the operations at the facility, including the hiring and firing of employees. (*Id.*) Before anyone could be hired, Winkley had to receive salary approval from corporate. (*Id.* at 51-52.) During the relevant time period, Charles Tuskan was employed by Grace as the operations manager at the East Chicago facility. (*Id.* at 17, 94.)

Turner is an African-American female who worked for Kelley Services and was assigned to perform temporary services at Grace in December 2006. (Turner Dep. at 30, 31, 63.) Turner began as a shipping clerk while the employee in that position was on vacation. (*Id.* at 31.) In January 2007, when the shipping clerk returned from

vacation, Grace continued Turner's assignment as a temporary production accounting clerk. (*Id.*) As a temporary production accounting clerk, Turner reported to Charles Tuskan, who reported directly to Patricia Winkley. (Turner Dep. at 102, Winkley Dep. at 15, 17, 94.)

Turner had no schooling, training, formal education or work experience in accounting, plant accounting, or bookkeeping. (Turner Dep. at 39-40.) Turner also did not have a college degree, nor had she ever been trained on or worked on SAP software before. (*Id.* at 24-26, 82, 102-103.) SAP software was the system that a production accounting clerk at Grace was responsible for using to run production and inventory reports. (Winkley Dep. at 45; Turner Dep. at 69-77.) SAP is customized for each company that uses it. (Turner Dep. at 80-82.)

On or about February 2007, Grace began a search to hire a permanent production accounting clerk. (Complaint ¶ 13.) Turner applied for the position and was interviewed by Winkley and Tuskan. (Turner Dep. at 121-122, 124.) During the interview Winkley informed Turner that she did not feel Turner was catching on as quickly as she would have liked. (*Id.* at 107; Winkley Dep. at 31.) Winkley also told Turner that she was making too many errors and that they were repetitive. (Winkley Dep. at 31.) During the interview, Tuskan told Turner that she did not have sufficient

manufacturing experience and that there were a couple of accounting areas she needed to work on. (Turner Dep. at 127-128.)

In early March 2007, Grace hired Moranski for the production accounting clerk position. (Winkley Dep. at 75-76.) Moranski had worked for the Wrigley Manufacturing Company for approximately 8 years and had significant relevant experience including experience working with SAP in a production setting. (Winkley Dep. Ex. 14.) Winkley made the decision to hire Moranski with Tuskan's input and selected Moranski because she had industrial and accounting experience, including prior experience with SAP entry, and had worked in a similar position with similar duties. (Winkley Dep. at 75-76.)

Moranski started in the production accounting clerk position on March 7, 2007. (Winkley Dep. Ex. 10 at ¶ 2.) She worked March 7 and March 8 and voluntarily resigned on March 9. (*Id.*) Moranski quit because she did not want to learn Grace's SAP system. (Winkley Dep. at 79.)

Plaintiff had remained in the temporary assignment at Grace to train Moranski as to the daily duties and responsibilities of her job. (Turner Dep. at 130.) After Moranski quit, Grace asked Turner to remain in the position through Kelly Services. (*Id.* at 103-105.) Turner also testified that after Moranski quit, Tuskan told her "I think you're doing an excellent job." (Turner Dep. at 152.) He further told her "You should be hired–" "It's Grace's

-14-

policy that you have to stay six months and then we can hire you."
(*Id.* at 105.) Turner testified that she understood Tuskan's
statement to mean that she had to stay until the end of May or
beginning of June. (*Id.*)

Grace's policy regarding temporary workers states that "[a]
temporary worker formerly assigned to Grace in an assignment that
is subsequently completed (regardless of length), may again be
selected for a different temporary assignment at Grace, but only
after a six-month period away from Grace." (Turner Dep. Ex. 9.)
Grace does not have a policy requiring temporary employees to work
for six months before being hired as a regular employee. (Winkley
Dep. at 66.)

Also at some point, Tuskan told Turner "you're doing a good
job. You know, there's a few things that you still have to work
on." (Turner Dep. at 111). In addition, Plaintiff asked for a $2.00
per hour raise and Winkley approved it on March 18, 2007. (Winkley
Dep. at 36-37.)

Winkley decided that if Turner showed improvement with her
performance and did not have significant errors in the upcoming
month-end closings, Grace would offer the position to Turner. (*Id.*
at 50-51.) At no time after March 9, 2007, did anyone employed by
Grace inform Turner that she would not be hired for the production
accounting clerk position. (Turner Dep. at 142, 154-155.)

On or about May 21, 2007, Winkley had decided to hire Turner pending approval of her salary ($39,500) to the full time production accounting clerk position. (Winkley Dep. at 51-56.) Winkley could not make an offer to Turner until Grace human resources approved the proposed salary. (*Id.* at 51-52.)

Plaintiff voluntarily resigned her employment on May 24, 2007. (Turner Dep. at 143-145.) She walked out of the Grace facility at about noon, without talking to Winkley, Tuskan, or any other Grace employee. (*Id.* at 31, 145, 172-173.) On the day that she walked out, Turner's six months had not expired. (*Id.* at 87.) Turner liked her assignment at Grace as a production accounting clerk and the individuals with whom she worked, and she wanted to be hired by Grace as a regular employee. (*Id.* at 166-67.) Turner, however, walked out because she believed that Grace was going to renew her contract for temporary work. (*Id.* at 143-45.)

Shannon Steffey was subsequently hired as the full time production accounting clerk. (Winkley Dep. at 92.) She is Caucasian. (*Id.*) Her annual salary was $41,500. (*Id.* at 111.) Winkley testified that she hired Steffey based on her prior experience in purchasing, logistics, inventory management, and import and export documentation listed on her employment application. (*Id.* at 112.)

After she quit, Turner filed a charge of discrimination with the EEOC stating the following:

> I was employed by Kelly Services since December 1, 2006.
> On May 24, 2007, I was forced to resign at which time I
> was working as a Production Accounting Clerk located at
> W.R. Grace.
>
> On May 24, 2007, I was forced to resign due to the fact
> that new hires, (white) were hired trained and offered
> positions. I was not given the opportunity to be hired
> for the Production Accounting Clerk position which was
> available, and I had interviewed for. They were only
> interested in extending my contract with them. I was
> informed by Charles Tuskan, Supervisor (white) that he
> would and promised to hire me but, to no avail he did
> not. I had an excellent job performance. Others were
> given appreciation awards yet I never received any. I was
> informed by Charles Tuskan that I have no industrial
> background and that they could not hire me, but yet, I
> was able to train other individuals. I was required to
> train my replacement Jill Moranski (white) who quit after
> 2 days due to being overwhelmed. On May 24, 2007, I
> informed Kelly Services that I had to resign because W.R.
> Grace would not offer me a position they only wanted to
> extend my contract.

(Turner Dep. Ex. 1.) Also in the charge, Turner provided only May 24, 2007, as the date range for the discriminatory conduct. (*Id.*) Turner was not represented or assisted by a lawyer when she filed this charge. (Turner Aff. ¶¶ 1-2.)

*Summary Judgment Standards*

Summary judgment motion standards are familiar. Pursuant to Rule 56(c) of the Federal Rules of Civil Procedure, summary judgment is appropriate where it is demonstrated that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law. *See Nebraska v. Wyoming*,

507 U.S. 584, 590 (1993); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986). The record must reveal that no reasonable jury could find for the nonmovant. *Karazanos v. Navistar Int'l Transp. Corp.*, 948 F.2d 332, 335 (7th Cir. 1991). In deciding a motion for summary judgment, a court must consider all facts in the light most favorable to the nonmovant. *Nat'l Athletic Sportswear, Inc. v. Westfield Ins. Co.*, 528 F.3d 508, 512 (7th Cir. 2008.)

The movant has the burden to identify "those portions of 'the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any,' which [the movant] believes demonstrate the absence of a genuine issue of material fact." *Celotex*, 477 U.S. at 323 (quoting Fed. R. Civ. P. 56(c)). Once the movant has met this burden, the nonmovant may not rest upon mere allegations, but must "set out specific facts showing a genuine issue for trial." Fed. R. Civ. P. 56(e)(2); *Becker v. Tenenbaum-Hill Assocs.*, 914 F.2d 107, 110 (7th Cir. 1990). If a party fails to establish the existence of an essential element on which the party bears the burden of proof at trial, summary judgment will be appropriate. In this situation, there can be "'no genuine issue as to any material fact,' since a complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial." *Celotex*, 477 U.S. at 322-23 (quoting Fed. R. Civ. P. 56(c)).

Generally, a Title VII plaintiff may only bring claims in a lawsuit that were included in an EEOC charge. *Cheek v. Western & Southern Life Ins. Co.*, 31 F.3d 497, 500 (7th Cir. 1994). Title VII plaintiffs can litigate claims not explicitly included in the EEOC charge if the allegations fall within the scope of the plaintiff's allegations contained in the EEOC charge. *Cheek v. Peabody Coal Co.*, 97 F.3d 200, 202 (7th Cir. 1996). In determining whether the allegations in the complaint fall within the scope of the EEOC charge, the court considers whether they are "like or reasonably related to" those contained in the EEOC charge. *Id.* This is a liberal standard that is satisfied if there is a reasonable relationship between the allegations in the charge and those in the complaint, and if the claims in the complaint could reasonably be expected to be discovered in the course of the EEOC's investigation. *Teal v. Potter*, 559 F.3d 687, 692 (7th Cir. 2009).

In her charge of discrimination filed with the EEOC, Plaintiff alleged the following:

> I was employed by Kelly Services since December 1, 2006. On May 24, 2007, I was forced to resign at which time I was working as a Production Accounting Clerk located at W.R. Grace.
>
> On May 24, 2007, I was forced to resign due to the fact that new hires, (white) were hired, trained and offered positions. I was not given the opportunity to be hired for the Production Accounting Clerk position which was available, and I had interviewed for. They were only interested in extending my contract with them. I was

informed by Charles Tuskan, Supervisor (white) that he
would and promised to hire me but, to no avail he did
not. I had an excellent job performance. Others were
given appreciation awards yet I never received any. I was
informed by Charles Tuskan that I have no industrial
background and that they could not hire me, but yet, I
was able to train other individuals. I was required to
train my replacement Jill Moranski (white) who quit after
2 days due to being overwhelmed. On May 24, 2007 I
informed Kelly Services that I had to resign because W.R.
Grace would not offer me a position they only wanted to
extend my contract.

(Turner Dep. Ex. 1.) The date range for the discriminatory conduct
is listed only as May 24, 2007. (*Id.*)

Grace's position is that the scope of the EEOC charge is
limited to a claim of constructive discharge because the only date
range Turner provided for her charge was May 24, 2007, and because
the language of her charge alleges she was discriminated against on
May 24, 2007. Turner argues that the scope of the charge includes
failure to hire her on multiple occasions. She contends that her
failure to hire claims are reasonably related to the constructive
discharge because they all arise out of the same concise set of
facts and that the EEOC would have had to investigate Grace's
failure to hire Turner in order to make a determination on her
charge of discrimination.

Although there is some ambiguity in the EEOC charge,
particularly because of the date range Turner provided, Turner's
failure to hire claims are reasonably related to her constructive
discharge claim because they form the basis of the alleged

constructive discharge. For this same reason, the EEOC would have had to investigate them in order to determine the merits of her constructive discharge claim. In any event, however, this issue need not be decided conclusively, because, as discussed below, Turner fails to create a genuine issue of material fact as to her discrimination and constructive discharge claims. *Ezell v. Potter*, 400 F.3d 1041, 1047 (7th Cir. 2005)("[W]e need not conclusively answer this question because, in any event, the conduct that Ezell describes is not severe or pervasive enough to qualify as a hostile environment.")

*Race Discrimination*

Turner brings her case under both Title VII and § 1981. Under Title VII, it is unlawful for an employer "to fail or refuse to hire . . . or otherwise to discriminate against any individual . . . because of such individual's race, color, religion, sex or national origin." 42 U.S.C. § 2000e-2(a)(1). Section 1981 provides that "[a]ll persons within the jurisdiction of the United States shall have the same right . . . to make and enforce contracts, . . . as is enjoyed by white citizens." 42 U.S.C. § 1981(a). The Title VII analysis governs both of these claims of discrimination. *Williams v. Waste Management of Illinois, Inc.*, 361 F.3d 1021, 1028 (7th Cir. 2004).

To prevail on her race discrimination claims, Turner must show discriminatory motive or intent. *See Sartor v. Spherion Corp.*, 388 F.3d 275, 278 (7th Cir. 2004). She may do so using the direct method, using direct or circumstantial evidence, or she may rely on the indirect burden-shifting method outlined in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973). *Id.*

Here, Turner argues that she can show discriminatory motive or intent through circumstantial evidence under the direct method of proof. To do so, Turner must produce evidence that points "directly to a discriminatory reason for the employer's action." *Adams v. Wal-Mart Stores, Inc.*, 324 F.3d 935, 939 (7th Cir. 2003).

Turner claims two arguments permit an inference of discrimination. First, she argues that two similarly situated Caucasian employees received better treatment than she did. Second, she argues that she was qualified for the job but was passed over twice and Grace's reasons were a pretext for discrimination.[2]

First, Turner argues that similarly situated Caucasians were given better treatment. Although Turner points to evidence showing Moranski and Steffey's terms and conditions of employment were better than hers, Turner points to no evidence showing that anyone

---

[2] Turner combines all her arguments for pretext together, however, the Court will analyze them according to Grace's proffered reasons for hiring of Moranski over Turner and Grace's proffered reasons for failing to hire Turner after Moranski resigned.

was similarly situated to her. Mere conclusory allegations are not sufficient to show someone is similarly situated. *Scaife v. Cook County*, 446 F.3d 735, 740 (7th Cir. 2006). Thus, without more, Turner cannot create an issue of fact as to whether similarly situated employees were treated more favorably.

Notably too, based on the record, it appears Turner is not similarly situated to Moranski and Steffey. The undisputed facts show that Moranski and Steffey had markedly more relevant prior experience than she did. Turner is simply not similarly situated to persons better qualified than she was. *Squibb v. Memorial Med. Ctr.*, 497 F.3d 775, 788 (7th Cir. 2007).

Second, Turner argues that she was qualified for the job, passed over in favor of Moranski, a Caucasian, and that Grace's reason for this was a pretext for discrimination. Grace contends and submits evidence that Moranski was more qualified than Turner. Grace also submits evidence that Winkley believed Turner was making too many errors and was not catching on fast enough to be hired as a full time employee as of the day she chose to hire Moranski.

Turner does present evidence, viewed in the light most favorably to her, creating a genuine issue of material fact as to whether she was qualified for the job. For example, Turner submits evidence that Grace asked her to fill the temporary position twice (Turner Dep. at 31, 103-105), that Tuskan told her she was performing well (*id.* at 152, 111), that Grace asked her to show

Moranski the duties and responsibilities of the job (*id.* at 130), that she was given a pay increase to keep her in the position (Winkley Dep. at 36-27), and that Tuskan told her that she "should be hired" (Turner Dep. at 105).

Nevertheless, at the time Moranski was hired, no reasonable jury could conclude that Grace did not believe she was more qualified than Turner. The undisputed facts show that during the interview, Tuskan informed Turner that she did not have sufficient manufacturing experience and that there were a couple of accounting areas she needed to work on. (Turner Dep. at 127-128.) In fact, Turner had no schooling, training, formal education, or work experience in accounting, plant accounting, or bookkeeping. (Turner Dep. at 39-40.) Nor had she ever been trained on or worked on SAP software before. (Turner Dep. at 24-26, 82, 102-103.) The undisputed evidence also shows that Moranski had industrial and accounting experience, including prior experience with SAP entry, and that she worked in a similar position with similar duties. (Winkley Dep. at 75-76.)

Turner argues that she was more qualified because she was asked to show Moranski the duties and responsibilities of the job, she was the incumbent in the position, and because Moranski quit the position after two days. To be probative of pretext, however, Turner would have to show her credentials were so clearly superior that a reasonable employer could not have concluded Moranski was

the better candidate. *See Millbrook v. IBP, Inc.*, 280 F.3d 1169, 1182 (7th Cir. 2002). Turner's evidence falls far short of this bar and, therefore, she fails to create an issue of fact with this argument as to whether Grace's proffered reason for hiring Moranski was pretextual.

Next, Turner argues that she was qualified for the job when Moranski quit and was told she would be hired into the position but had to wait until the end of May or the beginning of June. (Turner Dep. at 105.) Grace argues Turner was not immediately hired because she was not catching on quickly enough and was making too many repetitive errors. The undisputed facts show that Winkley informed Turner of these problems during her interview for the position. (Turner Dep. at 107; Winkley Dep. at 31.) Winkley also testified that after Moranski quit, she decided to give Turner a chance to improve her performance issues for a couple of months and potentially offer the full-time position to Turner if she showed improvement. (Winkley Dep. at 50-51.)

Turner argues Grace's reason was pretextual because staying beyond six months is in direct opposition to a written policy at Grace. The evidence shows that Tuskan told her that she had to stay until her six months was complete, *i.e.*, until the end of May or beginning of June. (Turner Dep. at 105, 134, 136, 152.) There is no evidence of any other understanding. Nor is there any evidence that this would have violated any policy. Rather, the policy at issue

-25-

states that "[a] temporary worker formerly assigned to Grace in an assignment that is subsequently completed (regardless of length), may again be selected for a different temporary assignment at Grace, but only after a six-month period away from Grace." (Turner Dep. Ex. 9.) Notably, this policy does not require six months away from Grace if the employee is hired for a permanent position following the temporary assignment. Accordingly, this argument fails to show pretext.

Turner also argues Grace's reason was pretextual because "Defendant lied to Ms. Turner by stating that she was required to work as a temp for six months before she could be hired full-time." (Plaintiff's Memorandum of Law in Opposition to Defendant's Motion for Summary Judgment (DE # 34)("Plaintiff's Brief") at p. 12.) The record does indicate that at the time Moranski quit, Tuskan told Turner that "It's Grace's policy that you have to stay six months and then we can hire you." (Turner Dep. 105.) Grace does not have a policy requiring temporary employees to work for six months before being hired as a regular employee. (Winkley Dep. at 66.) Even so, this does not address Grace's belief that Turner had performance issues. And, therefore, this argument does not establish this reason was pretextual. *See Chiaramonte v. Fashion Bed Group, Inc.*, 129 F.3d 391, 398 (7th Cir. 1997)("Where defendants have proffered more than one reason for the dismissal,

plaintiff must address *all* the reasons suggested by the defendants.")

In another attempt to show pretext, Turner, argues that she was not having performance issues because Grace kept her in the temporary position, agreed to give her a raise, and told her, through Tuskan, that she was doing a good job. These general claims of adequate performance, however, do not refute Grace's specific reasons for not hiring Turner for the permanent position, namely that she was not catching on quickly enough and that she was making repetitive errors. *See Dey v. Colt Constr. & Dev. Co.*, 28 F.3d 1446, 1460-61 (7th Cir. 1994)("[A] plaintiff may create an issue of fact by specifically refuting facts that allegedly support the employer's claim of performance deficiencies.") Accordingly, this argument is insufficient to create a material issue of fact as to whether Grace honestly believed its reasons for not hiring Turner when Moranski quit.

Turner also claims pretext because Winkley allegedly lied when she stated that she needed salary approval to hire Turner at the end of May. The undisputed evidence shows that on or about May 21, 2007, Winkley had decided to hire Turner. (Winkley Dep. at 51). Winkley testified that she needed salary approval before she could actually make the offer. (*Id.*) Turner argues that Winkley did not need salary approval because corporate had already approved the position. This inference, however, is not reasonable in light of

Winkley's testimony. Without some evidence rebutting Winkley's testimony, Turner's argument is speculation and fails to establish any pretext. *See McDonald v. Vill. of Winnetka*, 371 F.3d 992, 1001 (7th Cir. 2004). ("Inferences that are supported by only speculation or conjecture will not defeat a summary judgment motion.")

Turner has failed to prove discrimination under the direct method of proof because her evidence does not tie Grace's failure to hire Turner to her race. *See, e.g., Adams v. Wal-Mart Stores, Inc.*, 324 F.3d 935, 939 (7th Cir. 2003)("[C]ircumstantial evidence, however, must point directly to a discriminatory reason for the employer's action. Otherwise, the plaintiff must proceed by way of the well-known indirect route."). Similarly, even if Turner had argued her case under the indirect method of proof, she could not have survived summary judgment because she failed to establish that Grace's reason for not hiring her was pretextual. *See Thomas-Bagrowski v. LaHood*, No. 08-3952, 2010 WL 185112, at *3 (7th Cir. Jan. 19, 2010)("The lack of evidence of pretext is reason enough to sustain the grant of summary judgment."). Accordingly, for the reasons set forth above, Grace's Motion for Summary Judgment on plaintiff's failure to hire claims is **GRANTED**.

*Constructive Discharge*

Plaintiff asserts that she was constructively discharged on May 24 due to the culmination of unreasonably hostile acts by the Defendant. In support of this contention, Turner rehashes her argument for her failure to hire claim and adds a fact, unsupported by admissible evidence, that she received a call from Kelly Services allegedly stating that Grace intended to renew her contract services. According to Turner, these facts establish a constructive discharge.

Here, because Turner's failure to hire claims fail as a matter of law, so too does her constructive discharge claim, which is based on the alleged failure to hire. *See Chambers v. Am. Trans Air, Inc.,* 17 F.3d 998, 1005-06 (7th Cir. 1994) (holding that plaintiff had no viable constructive discharge claim because, even if her working conditions were intolerable, they had nothing to do with her protected status). Moreover, Turner's claim of constructive discharge fails because, to prevail on her claim, Turner would need to present evidence even more egregious than the high standard for hostile work environment. *E.E.O.C. v. Univ. of Chicago Hosps.*, 276 F.3d 326, 331-32 (7th Cir. 2002). Yet, Turner fails to allege any sort of harassment necessary to establish a hostile work environment. *See Porter v. Erie Foods Int'l, Inc.,* 576 F.3d 629, 634 (7th Cir. 2009). Rather, Turner testified that she liked her assignment at Grace as a production accounting clerk and

the individuals with whom she worked, and that she wanted to be hired by Grace as a regular employee. (Turner Dep. at 166-67.) For these reasons, Summary Judgment in favor of Grace is **GRANTED** on Turner's constructive discharge claim.

CONCLUSION

For the reasons set forth above, Grace's Motion for Summary Judgment (D.E. #27) is **GRANTED** and Grace's Motion to Strike is (D.E. #41) is **GRANTED in part and DENIED in part**. Accordingly, the Clerk is **ORDERED** to enter judgment on behalf of Defendant and against Plaintiff. The Clerk is further **ORDERED** to close this case.

DATED:  March 4, 2010              **/s/RUDY LOZANO, Judge**
                                   **United States District Court**